IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. ABA-24-336 |
| | * | |
| JENNIFER TINKER, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | ******* | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through Kelly O. Hayes, United States Attorney for the District of Maryland and Joseph L. Wenner, Assistant United States Attorney, moves this Court to sentence Defendant Jennifer Tinker ("Tinker") to the following:

- A guideline sentence (70 to 87 months) of incarceration in the Bureau of Prisons;
- Supervised release of 3 years; and
- Restitution of $1,199,561.82 to her victims and a $100 special assessment.[1]

Over five years, Tinker embezzled nearly $1.2 million from two different employers. She continued to steal from one after she promised this Court that she posed no financial risk to that employer. Respectfully, such brazen conduct demands a guideline sentence.

## BACKGROUND

### I. Procedural History

In November 2024, the government charged Tinker with one count of wire fraud related to her embezzlement of over $1 million from a former employer ("Real Estate Agency 1"). ECF No.

---

[1] The government's restitution calculation is set forth in Exhibit 1 and below. The government further asks the Court to impose forfeiture consistent with the government's preliminary order of forfeiture, which is being separately submitted.

1. On December 6, 2024, Tinker made her initial appearance. ECF No. 4. At the hearing, while the Court was attempting to determine whether she posed a financial risk to her present employer, Tinker represented through counsel that her current employment at Non-Profit 1 provided her with no access to financials or bank accounts.[2] With the concurrence of all parties, the Honorable Thomas J. Sullivan ordered Tinker released pending conditions, including that "the defendant must not violate any federal, state or local law while on release." ECF No. 8. On December 19, 2024, the Defendant pleaded guilty to the one count information. ECF No. 10.

In February 2025, the government moved to revoke the Defendant's release conditions under 18 U.S.C. § 3148(b), alleging that there was probable cause that the Defendant had committed a crime while on release. ECF No. 16. At the bail review hearing, Chief Judge Sullivan agreed with the government, finding that "pursuant to 18 U.S.C. § 3148 there is probable cause that Ms. Tinker committed a federal crime (bank fraud)." ECF No. 31. He subsequently ordered the Defendant detained. *Id.*

In July 2025, Tinker appeared again before this Court to plead guilty pursuant to a revised plea agreement. ECF No. 39 ("Plea Agreement"). In that Plea Agreement, Tinker pleaded guilty to one count of wire fraud, agreed to a new calculation of the applicable sentencing guidelines, and admitted to additional relevant conduct. *See id.*

---

[2] Tinker's counsel, after a lengthy discussion with the Defendant, relayed Tinker's representations that Tinker had "no control of cash or direct deposits" and that Tinker "made sure that she's not putting anyone in the position where she's entrusted with any money." *See* Exhibit 2, Audio Recording of Initial Appearance, at 10:45 and 12:15, *United States v. Tinker*, 24-336 (Dec. 6, 2024).

## II. Criminal Conduct

As stipulated in the Plea Agreement, Tinker admits to embezzling nearly $1.2 million from two successive employers. *See* Plea Agreement at 10-13. Both employers entrusted Tinker with their banking information and financial security. Tinker instead stole those organizations' funds, using them for concerts, vacations, cars, and other personal expenditures. Tinker continued to steal funds even after she had (1) been fired for embezzlement by one employer, (2) pleaded guilty in this Court to that conduct, and (3) falsely asserted to Probation and Chief Judge Sullivan that she had no access to her second employer's financials.

Tinker's first victim was Real Estate Agency 1. Prior to this offense, Tinker had worked at Real Estate Agency 1 for nearly a decade. For most of that time, she held a position with financial authority and control: Tinker was responsible for Real Estate Agency 1's accounts receivable, accounts payable, and commission payments. She had access to Real Estate Agency 1's bank accounts, and her superiors trusted her to make financial transactions on behalf of Real Estate Agency 1 with minimal supervision.

Tinker abused that trust. Between January 2020 and November 2023, Tinker embezzled over $1 million from Real Estate Agency through surreptitious transfers to her personal bank accounts. Several thousand dollars at a time, Tinker syphoned funds from Real Estate Agency 1's escrow, commission, and operating accounts. Most commonly, she did so through over 90 fraudulent wire transfers.

Tinker took calculated efforts to hide her theft. She listed fictitious recipients on the wire transfer paperwork to make them appear like legitimate real estate transactions—"MD Homes LLC," "Escrow Release," and "Main Homes." All of these transfers went to Tinker's personal

3

accounts. Tinker also doctored Real Estate Agency 1's internal accounting records to conceal her transfers from her co-workers and supervisors for years.

Within days of stealing these funds, Tinker would then spend them on luxury goods and personal expenditures. The stipulation of facts provides explicit details: long weekends in Las Vegas; floor tickets to Taylor Swift; five-day vacations at Disney's Caribbean Beach resort—all booked within days of a corresponding fraudulent wire transfer. The aggregate numbers of frivolous personal spending are also staggering. Over her embezzling spree, Tinker spent over $167,000 on Amazon purchases, $21,000 on Louis Vuitton products, and $13,000 on Balenciaga couture. She continued until Real Estate Agency 1 discovered her theft and promptly fired her.

Defrauding one employer wasn't enough for Tinker. Within six months of being fired from Real Estate Agency 1, she began embezzling funds from her new employer Non-Profit 1. Non-Profit 1 hired Tinker as a bookkeeper in March 2024. (She failed to disclose to Non-Profit 1 that she had been fired from Real Estate Agency 1 for embezzlement.) Within two months, Tinker began making fraudulent transfers from Non-Profit 1's bank accounts to pay off her personal credit cards with Apple/Goldman Sachs and Discover.

Like before, this fraud funded Tinker's frivolous personal spending. For example, on May 28, 2024, Tinker transferred $3,285.09 from Non-Profit 1's operating account (ending in 2637) to her Apple/Goldman Sachs card account. That same day, Tinker made three purchases from the Bonnaroo Music Festival[3] for a total of $3,285.09. These transactions are illustrated below in Figures 1 & 2.

---

[3] Bonnaroo is an annual four-day music festival hosted in Manchester, Tennessee. The featured artists for the 2024 event—which ran June 13-16—included Red Hot Chili Peppers, Post Malone, T-Pain, and Megan Thee Stallion. *See* https://www.billboard.com/music/concerts/2024-bonnaroo-festival-lineup-1235578409/.

| Apple Card Customer<br>Jennifer Tinker, jtinker0129@gmail.com | | May 1 — May 31, 2024 |
|---|---|---|
| **Payments** | | |
| *Payments made by Jennifer Tinker* | | |
| Date | Description | Amount |
| 05/07/2024 | ACH Deposit Internet transfer from account ending in 4437 | -$3,828.85 |
| 05/07/2024 | MANUAL PAYMENT REVERSAL - INSTANT PAY | $3,828.85 |
| 05/10/2024 | ACH Deposit Internet transfer from account ending in 2637 | -$3,828.85 |
| 05/28/2024 | ACH Deposit Internet transfer from account ending in 2637 | -$3,285.09 |

*Figure 1: May 2024 statement from Tinker's Apple/Goldman Sachs card, illustrating two $3,285.09 payments from Non-Profit 1's operating account ending in 2637 on May 10 and May 28. Highlights are added to the May 28 payment.*

| **Transactions** | | | |
|---|---|---|---|
| *Transactions by Jennifer Tinker* | | | |
| Date | Description | Daily Cash | Amount |
| 05/28/2024 | FGTBONNAROO 1645 E 6TH ST, STE 200 5123890315 78702 TX USA | 1%   $10.95 | $1,095.03 |
| 05/28/2024 | FGTBONNAROO 1645 E 6TH ST, STE 200 5123890315 78702 TX USA | 1%   $10.95 | $1,095.03 |
| 05/28/2024 | FGTBONNAROO 1645 E 6TH ST, STE 200 5123890315 78702 TX USA | 1%   $10.95 | $1,095.03 |

*Figure 2: May 2024 statement from Tinker's Apple/Goldman Sachs card, illustrating three $1,095.03 payments to the Bonnaroo Music Festival on May 28, 2024. Highlights are added.*

In addition to these surreptitious transfers, Tinker also defrauded Non-Profit 1 through outright deception. From October through December 2024, Tinker submitted proposed transfers to Non-Profit 1's president for approval, telling the president that they were for Non-Profit 1's office rent. Tinker had actually changed the destination account to her own personal account with Discover. Relying on Tinker's misrepresentations, Non-Profit 1 approved these payments.

Tinker continued stealing money from Non-Profit 1 even as she pleaded guilty to stealing money from Real Estate Agency 1. She lied to Chief Judge Sullivan at her initial appearance on December 6, 2024, claiming Non-Profit 1 need not be notified as to her criminal charges because

5

she did not have access to Non-Profit 1's bank accounts and did not pose a financial risk. This lie allowed her to continue to pilfer Non-Profit 1's accounts mere days after her initial appearance. Indeed, bank records show that in the two weeks after her initial appearance, Tinker fraudulently transferred over $3,300 from Non-Profit 1 to her Apple/Goldman Sachs card. One of these transfers processed on December 19, 2024—the day Tinker pleaded guilty in this Court.

| Date | Description | Amount |
|---|---|---|
| 12/13/2024 | ACH Deposit Internet transfer from account ending in 2637 | -$343.98 |
| 12/15/2024 | Apple Cash payment | -$684.07 |
| 12/16/2024 | ACH Deposit Internet transfer from account ending in 2637 | -$439.24 |
| 12/16/2024 | ACH Deposit Internet transfer from account ending in 2637 | -$2,100.00 |
| 12/17/2024 | Apple Cash payment | -$7.37 |
| 12/17/2024 | ACH Deposit Internet transfer from account ending in 2637 | -$295.98 |
| 12/18/2024 | Apple Cash payment | -$2.15 |
| 12/18/2024 | ACH Deposit Internet transfer from account ending in 2637 | -$145.02 |
| 12/18/2024 | Apple Cash payment | -$0.68 |
| 12/19/2024 | Apple Cash payment | -$2.07 |
| 12/19/2024 | ACH Deposit Internet transfer from account ending in 2637 | -$45.82 |

***Figure 3: December 2024 statement from Tinker's Apple/Goldman Sachs card, illustrating six fraudulent payments from Non-Profit 1's operating account, ending in 2637—include one that processed the day of Tinker's guilty plea (December 19).***

Tinker did not stop until law enforcement arrested her and her pretrial release was revoked. In total, between May 2024 and January 2025, Tinker stole over $100,000 from Non-Profit 1.

### III.    Guidelines Calculation

The parties agree with the Pre-Sentence Report's calculation that the total offense level in this matter is 27. *See* Plea Agreement at 4-5; ECF No. 42 ("PSR") at 14-15. The base level offense level for wire fraud under the United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1 is seven. Plea Agreement at 4; PSR at 14. An added 14 levels apply because the loss in this case is between $550,000 and $1.5 million. Plea Agreement at 4; PSR at 15. The offense level increases another six levels because of the following enhancements: the offense resulted in substantial financial

hardship to one or more victims; Tinker abused a position of private trust in committing or concealing the offense; and Tinker willfully obstructed the administration of justice with respect to the prosecution and sentencing of her wire fraud offense, and that conduct related to the offense. *Id.* Because Tinker obstructed justice, she receives no reduction under U.S.S.G. § 3E1.1. *Id.* The government concurs that Tinker has a Criminal History Category I. An offense level of 27 and a Criminal History I establish a guideline range of 70 to 87 months' imprisonment.

## ARGUMENT

### I. A Guidelines Sentence is Appropriate Under Section 3553(a).

As this Court is well aware, it must impose a reasonable sentence that is sufficient but not greater than necessary to achieve the goals of sentencing based on multiple factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," the need "to promote respect for the law," the need for just punishment without unwarranted sentencing disparities and the need for both specific and general deterrence. 18 U.S.C. § 3553(a). The guidelines have it right here. The amount of money Tinker embezzled, the harm it caused to her former employers, and her refusal to stop until law enforcement detained her all compel a significant term of imprisonment.

*A. The Nature and Circumstances of Tinker's Embezzlement are Serious and Troubling*

For five years, Tinker stole money from two consecutive employers. The first was a small business that gave Tinker the authority and discretion to handle its finances. In return, she skimmed over $1 million from Real Estate Agency 1's accounts over three years. She did the same to Non-Profit 1, stealing over $100,000 in a matter of months. The actual loss in this case alone shows the severity of Tinker's conduct.

The victim impact statements, however, provide a deeper perspective of Tinker's harms. Real Estate Agency 1 had employed Tinker for over a decade. As one employee puts it, "Jennifer was my friend, someone I confided in." Exhibit 3 (Consolidated Real Estate Agency 1 Victim Impact Statements) at 3. Yet this trust and these relationships mattered little to Tinker; she threw them away for greed, leaving those who had thought of her as a friend to clean up her financial mess. One of the partners of Real Estate Agency 1 needed to inject $400,000 of her personal savings to keep the company running. *See id.* at 1. Real Estate Agency 1's employees and managers also suffered health consequences as they dedicated hundreds of hours to answering complaints from customers and real estate agents whose funds were lost in escrow, fixing years of Tinker's intentional accounting errors that had covered her tracks, and rebuilding the company's reputation. *See id.* at 1, 2-3, 6.

Non-Profit 1 suffered similarly. As an organization with fewer than 4 full-time employees, Non-Profit 1 is not designed to withstand a $100,000 theft. Its vice president explains: "the actions of Ms. Tinker have threatened the very foundation of our non-profit." Exhibit 4 (Consolidated Non-Profit 1 Victim Impact Statements) at 7. Although Non-Profit 1's financial loss was eventually covered by insurance, Tinker's fraud still put the organization in existential jeopardy. A grant-funded organization, Non-Profit 1 was faced with assuring grant funders that future capital will be secure—despite Tinker's sizable theft. *Id.* at 2, 6, 8.

Tinker's repeated pattern of fraud lined her own pockets and financed a lavish lifestyle. In her own words, she bought "ridiculous things." Exhibit 5 at 11:28 (Audio of June 18, 2024 Interview with FBI) (Native Exhibit). And her purchase patterns evince her carefree approach to her fraud. Vacations and concert tickets purchased on a whim. Nearly a half dozen cars. Thousands upon thousands of dollars toward personal expenditures of no consequence beyond enhancing the

8

trappings of Tinker's day-to-day life. For five years, her employers' bank accounts were Tinker's personal ATMs. The guidelines adequately capture the scope and harm of Tinker's offenses.

### B. Tinker's Misconduct Displays her Disrespect for the Law and a Need for Deterrence

Tinker did not only deceive her victims. She deceived this Court. Tinker stole money from Non-Profit 1 *the same day* she stood before this Court and professed to take responsibility for her fraud. She did so just days after assuring Judge Sullivan that she was not a financial risk to Non-Profit 1 and that she couldn't access Non-Profit 1's bank accounts. She asked the Court to not notify Non-Profit 1 of her charges, claiming that she wanted to be able to work to pay back Real Estate Agency 1. *See* Exhibit 2 at 12:38 & 13:13. This too was false. Tinker wanted to continue stealing money from Non-Profit 1. And she was willing to lie to the Court so she could do so.

Tinker had lied to extend her fraud on Non-Profit 1 before this. In June 2024, the FBI interviewed Tinker about her embezzlement from Real Estate Agency 1. In that interview, she admitted to stealing from Real Estate Agency 1. She stated she was able to get away with it for years because her immediate supervisor "trusted me." Exhibit 5 at 20:33. She stated she wanted to "do 100% right by" Real Estate Agency 1 moving forward. *Id.* at 15:25. But when asked if she "handled financials in any way" at her new job at Non-Profit 1, she said "no" and falsely claimed she was only an office manager. *Id.* at 13:54. When asked if there was anything else that she "wanted to come clean about," Tinker said no. *Id.* at 29:28. Unbeknownst to the government, Tinker had already stolen thousands of dollars from Non-Profit 1 at the time of the interview and would steal thousands more afterward.

At the time, Tinker appeared to be fully cooperative and seeking to take responsibility for her theft from Real Estate Agency 1. Now—knowing that she was defrauding a new employer *at the time of this interview*—Tinker's supposed professions of admiration for her former employer

9

and her expressions of regret ring hollow. And they display her disturbing ability to not let her ongoing crimes prevent her from producing a convincing display of purported remorse.

Tinker's sentence must account for this need for specific deterrence. Getting caught stealing by Real Estate Agency 1 did not stop Tinker from stealing from Non-Profit 1. An interview with the FBI did not stop Tinker from stealing from Non-Profit 1. Pleading guilty to stealing from Real Estate Agency 1 did not stop Tinker from stealing from Non-Profit 1. Anything less than a guidelines sentence runs the risk that Tinker will remain similarly undeterred from future theft.

### C. The History and Characteristics of the Defendant Merit a Significant Sentence.

Tinker's history as described in the PSR provides little to explain away her conduct. There was no substance abuse or addiction that fueled her spending spree. There were no unfunded medical treatments that put Tinker in dire financial straits. There was simply Tinker's own greed, her capability for deceit, and her desire to live beyond her means. Her $90,000 salary at Real Estate Agency 1 alone could not fund the front row concert tickets, the extravagant vacations, the hundreds of thousands of dollars of Amazon and luxury goods that she wanted. So she took whatever money she needed to live the life she desired. Despite having a family, supportive parents, and co-workers who trusted her, Tinker still chose—again and again—to steal from and defraud her employers of nearly $1.2 million. This deserves a significant term of incarceration.

## II.     The Restitution in this Case is $1,199,561.82.

In her plea agreement, Tinker agreed to the entry of a restitution order for the amount of the victims' losses, which she stipulated was at least $1,191,250. This amount came from Tinker's stipulation that she embezzled at least $1,091,250 from Real Estate Agency 1 and at least $100,000 from Non-Profit 1. Non-Profit 1's insurance agency has calculated Non-Profit 1's actual loss from Tinker's theft to be $108,311.82. This amount is in line with the government's calculations.

Accordingly, the government is requesting a total restitution amount of $1,199,561.82. Exhibit 1 provides a detailed breakdown of the restitution recipients, which includes payments to Real Estate Agency 1, Real Estate Agency 1's insurer, and Non-Profit 1's insurer.

## CONCLUSION

For the reasons set forth herein and further discussed at the sentencing hearing, the government respectfully requests that the Court sentence the Defendant as follows:

- Impose a guideline sentence of incarceration (70 to 87 months).
- Place Tinker on supervised release for a period of three years.
- Order restitution of $1,199,561.82 and a $100 special assessment.

The government views this recommended sentence to be sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By: _____/s/_____
Joseph Wenner
Assistant United States Attorney

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system on October 27, 2025.

                                             /s/
                                    Joseph Wenner
                                    Assistant United States Attorney